USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/16/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
ALFRED MILANO,                                           :
                                                        :
                              Plaintiff,                 :
                                                        :
            -against-                                    :          19-CV-3357 (VEC)
                                                        :
                                                        :          FINDINGS OF FACT AND
PROVIDENT LIFE & CASUALTY INSURANCE :                               CONCLUSIONS OF LAW
COMPANY and PAUL REVERE LIFE            :
INSURANCE COMPANY,                                      :
                                                        :
                              Defendants.   :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), challenging Defendants' denial of his claim for disability benefits. On May 22, 2020, Defendants moved for summary judgment. Dkt. 40. On June 24, 2020, Plaintiff cross-moved for summary judgment, or in the alternative, for judgment on the administrative record. Dkt. 41. On December 7, 2020, the Court held oral argument and denied Defendants' motion for summary judgment. The parties agreed that the Court would conduct a bench trial "on the papers" and issue findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). *See Muller v. First Unum Life Ins. Co.,* 341 F.3d 119, 124 (2d Cir. 2003). This case turns on one factual issue—whether Plaintiff is able to perform his occupation as a bond salesman. Because the Court finds that Plaintiff has not met his burden to show that he is disabled under Defendants' policies, judgment is entered for Defendants.

## FINDINGS OF FACT

The following section constitutes the Court's findings of fact, pursuant to Federal Rule of Civil Procedure 52(a)(1).  The findings of fact are drawn from the Administrative Record.[1]  "To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa."  *Barbu v. Life Ins. Co. of N. Am.,* 35 F. Supp. 3d 274, 280 (E.D.N.Y. 2014).

### A.  Background

Plaintiff is a bond salesman who has worked in the financial industry since 1983.  Nazir Certification, Dkt. 40, Ex. 6 at 220 ¶ 7.[2]  Plaintiff began his career at Salomon Brothers, which was subsequently acquired by Smith Barney & Co., and later by Citigroup Global Markets, Inc. ("Citi").  *Id.*  In April 2012, as a result of a corporate restructuring, Plaintiff left Citi to work at Cantor Fitzgerald & Co., for which he worked until March 2013.  *Id.* at 225 ¶¶ 20-21.  In December 2014, Plaintiff began volunteering at Fox Chase Capital Partners, a small broker-dealer owned by Plaintiff's friend.  *Id.* at 227 ¶ 30.  Plaintiff claims that he sporadically works at Fox Chase as a consultant but earns no income.  *Id.*

Plaintiff suffers from post-traumatic stress disorder ("PTSD"), depression, and anxiety as a result of witnessing the September 11, 2001 terrorist attacks on the World Trade Center.[3]  Ex. 6 at 219-20 ¶¶ 3-4; 226-27 ¶¶ 24, 25, 27.  Many of Plaintiff's friends and colleagues, as well as his

---

[1]     The Court previously denied Plaintiff's motion to supplement the Administrative Record with extrinsic evidence. Dkt. 28.

[2]     Unless otherwise specified, all citations refer to the exhibits attached to the Nazir Certification, Dkt. 40. Page numbers correspond to the Bates Stamps on the lower right-hand corner of each page.

[3]     Plaintiff claims that subsequent events contributed to his anxiety.  For example, Plaintiff witnessed the crash of American Airlines flight 587 in November 2001, which he is convinced was a terrorist attack.  Ex. 20 at 584 ¶ 15.  Plaintiff is also convinced that the blackout in New York City in August 2003 was a terrorist attack.  *Id.* ¶ 16.  Finally, Plaintiff's niece was running in the Boston Marathon in April 2013 when the bombing occurred; Plaintiff claims this confirmed his belief that he and his family were "imperiled by terrorists."  *Id.* at 586 ¶ 22.

brother, worked in the World Trade Center and died in the attacks. Ex. 6 at 222 ¶ 13. In

December 2013, Plaintiff began seeing licensed social worker, Mr. Craig Podell, for individual

therapy sessions to treat his PTSD. Ex. 6 at 220 ¶ 27; Ex. 6 at 236. In March 2014, upon referral

from Mr. Podell, Plaintiff began seeing Dr. Marina Feygin, a psychiatrist. Ex. 1.

On April 21, 2016,[4] Plaintiff filed a claim for disability benefits with Defendants

Provident Life and Casualty Insurance Company ("Provident Life") and The Paul Revere Life

Insurance Company ("Paul Revere") (collectively "Defendants").[5] Ex. 1. Disability benefits are

payable under the Provident Policy when an insured submits sufficient proof that he is either

totally or partially disabled. The Provident Policy provides, in relevant parts:

> Total Disability, or totally disabled, means that, due to Injuries or Sickness:
>
> i.    You are not able to perform the substantial and material duties of your
>       occupation;
>
> ii.   you are not working in any other gainful occupation; and
>
> iii.  you are receiving the care of a Physician which is appropriate for the
>       condition causing your disability and which is intended to help you return
>       to work in your occupation. We will waive this requirement when we are
>       furnished proof, satisfactory to us, that continued care would no longer be
>       of benefit to you.

Ex. 2 at 178. Provident's Policy defines "occupation" as "the occupation (or occupations, if

more than one) in which you are regularly engaged at the time you become disabled. An

---

[4]    Plaintiff submitted Dr. Feygin's Initial Attending Physician statement to Defendants on April 21, 2016.
*See* Ex. 1. After Defendants informed Plaintiff that further documentation was required, Plaintiff supplemented his
submission on June 20, 2016. *See* Exs. 5-7.

       On June 30, 2016, after reviewing Plaintiff's claim submission, Defendants asked Plaintiff why he did not
file a claim until more than two years after he began psychiatric treatment in March 2014. Ex. 8. On July 11, 2016,
Defendants spoke with Plaintiff's attorney, who explained that the two-year delay in filing a disability claim was
because Plaintiff was "not thinking straight" and that he did not realize his condition was disabling until he began
treatment. Ex. 11 at 416.

[5]    Plaintiff enrolled in Provident's long-term disability policy in 1999, Ex. 2, and in Paul Revere's long-term
disability policy in 1993, Ex. 3.

occupation includes all jobs that have similar substantial and material duties with due regard to position and earnings.  An occupation is not necessarily restricted to a specific job, company, or industry."  *Id.* at 177.

Similarly, disability benefits are payable under the Paul Revere Policy when an insured submits sufficient proof that he is either totally or partially disabled.  The Paul Revere Policy provides, in relevant part:

> Total Disability means that because of Injury or Sickness:
>
> i.    You are unable to perform the important duties of Your Occupation; and
>
> ii.   You are receiving Physician's Care. We will waive this requirement if we receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

Ex. 3 at 142.  The Paul Revere Policy defines "Occupation" as "the occupation or occupations in which you are regularly engaged at the time disability begins."  *Id.*

Plaintiff asserts that he was totally disabled under Defendants' policies as of March 26, 2013.[6]  *See* Exs. 6, 9.  Specifically, Plaintiff claims that his PTSD, anxiety, and panic disorder prevent him from performing the material and important duties of a bond salesman, which he describes as working in Manhattan, taking business trips, and interacting with diverse people. Ex. 20 at 587-88 ¶ 26; *see also* Ex. 20 at 583 ¶ 12 (describing his job as requiring "a rare mix of mental focus, physical stamina, comfort around people, [and] ease in traveling.").

On August 29, 2016, Defendants denied Plaintiff's claim for benefits.  Ex. 18.  On October 27, 2017, Defendants' upheld the decision on appeal.  Ex. 29.

---

[6]    Certain of Plaintiff's submissions indicate dates of disability of March 26, 2001 and March 26, 2011.  *See* Exs. 8, 9.  Plaintiff's attorney subsequently clarified to Defendants that Plaintiff was claiming a disability date of March 26, 2013, the day he was discharged from Cantor Fitzgerald.  Ex. 9 at 397.

**B. Plaintiff's Medical Records**

    i.      Dr. Feygin: Plaintiff's Treating Psychiatrist

Dr. Feygin began treating Plaintiff on March 27, 2014. Ex. 1 at 27. Dr. Feygin

diagnosed Plaintiff with PTSD, major depressive disorder, and generalized anxiety. *Id.* In April

2016, Dr. Feygin provided an Attending Physician Statement to Defendants in connection with

Plaintiff's claim for disability benefits. Ex. 1. Dr. Feygin described Plaintiff's symptoms as

"depressed mood, irritability, anxiety, insomnia, [and] fear of terrorism." *Id*. at 27-28. Dr.

Feygin described Plaintiff's "current behavioral health restrictions (activities patient should not

do)," as "ongoing limitations riding subway." *Id.* at 28. Dr. Feygin noted that Plaintiff "[e]asily

avoid[s] subways and trains" because he "gets overwhelmed."[7] *Id.* at 29. Finally, Dr. Feygin

indicated that she expected improvement in Plaintiff's functional abilities and noted that he "is

doing better on [medications], but easily gets overwhelmed by family related stress and feels

unsafe due to terrorism." *Id.*

Dr. Feygin's treatment notes spanning from 2014 to 2017 corroborate the information

provided in her Attending Physician Statement. *See* Ex. 27 at 773-81. Her treatment notes

repeatedly indicate that Plaintiff is unable to take the subway, has difficulties flying, avoids tall

buildings, fears terrorist attacks, and feels anxious in crowded places and "around people with

dark skin." *See* Ex. 27 at 773-79.

    ii.      Mr. Podell: Plaintiff's Treating Psychotherapist

Plaintiff met with Mr. Podell for individual therapy sessions on an on-and-off basis from

2013 to 2017.[8] *See* Exs. 6; 27. On June 14, 2016, Mr. Podell provided an Attending Physician

---

[7]      Dr. Feygin's exact note reads: "Easily avoidance of subways and trains. Gets overwhelmed." Ex. 1 at 29.

[8]      Beyond missing numerous appointments, Plaintiff would go for months seeking no treatment from Mr. Podell. For example, Plaintiff discontinued treatment in June 2016, only to resume at the urging of his psychiatrist in March 2017. Ex. 27 at 794.

Statement to Defendants in connection with Plaintiff's claim for disability benefits. Ex. 6 at 233-35. Mr. Podell stated that Plaintiff is unable to travel, fly, maintain focus on work-related tasks, take public transportation, or visit Manhattan without enduring panic. *Id.*

Mr. Podell's treatment notes, however, are not entirely consistent with the Attending Physician Statement. For example, although Mr. Podell's Attending Physician Statement indicated that Plaintiff is unable to travel or fly, his treatment notes from April 10, 2014 indicate that Plaintiff flew to Detroit to see his nephew play hockey. Ex. 6 at 237. Moreover, following the trip to Detroit, Mr. Podell noted that Plaintiff "was gratified that he was able to travel," and stated that "he was able to handle his fears of flying and terrorism as he focused on his anger at his wife." *Id.* Similarly, on June 23, 2016, only nine days after Mr. Podell submitted his Attending Physician Statement claiming that Plaintiff was "unable to travel," Mr. Podell described Plaintiff's excitement at being "able to travel with his son and his class on a school trip to Philadelphia." Ex. 27 at 794.

Moreover, although Mr. Podell emphasized Plaintiff's anxiety and panic in his Attending Physician Statement, when read as a whole, Mr. Podell's years of treatment notes show that the severity of Plaintiff's anxiety and panic fluctuates considerably. For example, in April 2014, Plaintiff reported that "he is much less anxious about terrorism than he was when he began psychotherapy," and in May 2014, Mr. Podell indicated that Plaintiff felt "somewhat more confident and in control of his anxiety." Ex. 6 at 237. Although Mr. Podell described a resurgence of Plaintiff's PTSD and anxiety in January 2016 due to terrorist attacks in Paris and California,[9] by April 2016, Mr. Podell indicated that Plaintiff was "able to moderate his anxiety"

---

[9]     Although Plaintiff does not specify, the Court assumes Plaintiff is referring to the terrorist attack in San Bernardino, California in December 2015 and the terrorist attack at Bataclan Concert Hall in Paris in November 2015.

through the use of "cognitive reframing and breathing tools." Ex. 6 at 238, Ex. 27 at 793.

Similarly, in June 2016, Mr. Podell noted that there was a "reduction in the frequency of

[Plaintiff's] acute anxiety states and fear of terrorism," and that much of Plaintiff's depression

was related to his marriage.[10]  Ex. 27 at 794.  In April 2017, Mr. Podell indicated that Plaintiff

self-reported "that his PTSD symptoms have been less frequent and less in duration when they

occur."  *Id.*  As late as August 2017, two months before Defendants' decision was upheld on

administrative appeal, despite stating that Plaintiff "remain[ed] fully disabled from being able to

function[] in any work setting due to his fragile psychological condition of PTSD, depression,

and overall disorganization," Mr. Podell reported that Plaintiff's "moments of vigilance and fear

appear to be less frequent and less pervasive."  Ex. 27 at 797-98.

       iii.     <u>Dr. Fried: Psychologist</u>

In February 2016, Dr. Feygin referred Plaintiff to Dr. Fried for psychological testing.  Dr.

Fried reported that personality test results "revealed a great deal of distress and confused

thinking [and that] multiple elevations in [Plaintiff's] clinical profile were primarily indicative of

overwhelming anxiety, depressive tendencies, and some paranoid thinking."  Ex. 6 at 268.  Dr.

Fried described Plaintiff as a man "consumed by debilitating anxiety and fearfulness,"

"overwhelmed by emotion," and with "severely compromised functioning."  *Id.*  Dr. Fried

recommended "adjustment in his medication to minimize his overwhelming internal distress . . . ,

supportive psychotherapy . . . , and some sort of involvement in structured daily activities."  *Id.*

Dr. Fried did not opine that Plaintiff had any specific limitations that would prevent him from

doing his job.  Instead, Dr. Fried stated that it would "benefit" Plaintiff to "engage in some sort

of productive day to day venture, be this paid or unpaid work."  *Id.*

---

[10]      This statement echoes Mr. Podell's notes from April 2014 observing that Plaintiff was beginning to
"recognize that his primary problem in his life is not his PTSD but rather his marital disharmony."  Ex. 6 at 237.

iv.    Plaintiff's Self-Reports

Plaintiff claims he suffers from severe anxiety and panic attacks as a result of his PTSD. Plaintiff summarizes his fears and anxieties as: (i) airplanes flying overhead; (ii) flying in airplanes; (iii) confined spaces such as subways, tunnels, and bridges; (iv) crowded places like city streets and train stations; (v) being in and around tall buildings; and (vi) being around people of Middle-Eastern or Indian descent, particularly if they are wearing traditional garb.  Ex. 20 at 587 ¶ 25.  Plaintiff claims that these fears make it impossible for him to perform the primary duties of a bond salesman, which, as noted *supra,* he describes as working in a skyscraper in Manhattan, taking business trips, and interacting with diverse people.[11]  *Id.* at 577 ¶¶ 4-6, 587 ¶ 26.

**C.  Defendants' Reviewers**

i.    Dr. Gitlow: Defendants' Reviewing Psychiatrist

On July 20, 2016, Dr. Gitlow reviewed Plaintiff's claim for disability benefits.  After analyzing Plaintiff's records, as well as the opinions of Dr. Feygin and Mr. Podell, Dr. Gitlow stated that he "agree[d] with treating psychiatrist [Dr. Feygin] that the claimant has been limited in terms of ability to use public transportation since [March 27, 2014] secondary to PTSD, but disagree[d] with [Mr. Podell] that the claimant is precluded from work secondary to overall impairment."  Ex. 14 at 445.  In other words, Dr. Gitlow concluded that Plaintiff's psychological conditions, and his resulting inability to use public transportation, do not prevent him from performing his job.

---

[11]    Plaintiff's last full time job was as a bond trader for Canter Fitzgerald, from which he was fired for misconduct, not for an inability to perform any essential duty of the position.  Ex. 20 at 586 ¶ 21.  Although Plaintiff believes that he was fired for an inability to perform, he has introduced no evidence in the record to support that belief.  *See* Ex. 20 at 585.  While the discharge for misconduct is not dispositive, it is some evidence that Plaintiff was capable of performing the essential duties of his position on the date he asserts he was totally disabled.

ii. <u>Dr. Shipko: Defendants' Designated Medical Officer</u>

On August 4, 2016, Defendants' Designated Medical Officer, Dr. Shipko, reviewed Plaintiff's claim. *See* Ex. 15. Dr. Shipko opined that "within a reasonable [degree of] medical certainty, restrictions and limitations precluding usual occupational functionality are not supported from the date of disability onward." Ex. 15 at 449. Dr. Shipko noted that "Dr. Feygin and Dr. Gitlow are in agreement that the claimant's only limitation relates to travel on public transportation." *Id.* Dr. Shipko acknowledged that Mr. Podell's treatment notes chronicled Plaintiff's anxiety, but concluded that Mr. Podell's notes "do not reflect that this rises to a level of impairment." *Id.*

iii. <u>Mr. Gaughan: Defendants' Vocational Consultant</u>

On August 23, 2016, Defendants' vocational consultant, Mr. Gaughan, conducted a vocational review of Plaintiff's claim. *See* Ex. 17. Mr. Gaughan concluded that, in order to perform his occupation, Plaintiff would need to be able "to make independent decisions; meet deadlines; supervise others; multi-task; adhere to regulatory protocols/requirements; sustain attention; [] problem solve and perform mathematical calculations of high complexity." Ex. 17 at 462. Mr. Gaughan stated that Plaintiff's "position would not require the use of public ground transportation" and that his job demands therefore did not exceed his limitations. *Id.*

iv. <u>Dr. Brown: Defendants' Reviewing Psychiatrist</u>

In October 2017, Defendants' Reviewing Psychiatrist Dr. Brown reviewed Plaintiff's appeal. *See* Ex. 28. Dr. Brown acknowledged that there was "evidence of [Plaintiff's] chronic psychiatric condition characterized by fluctuating levels of anxiety and depression," but he concluded that "the weight of the evidence does not support the presence of ongoing restrictions and limitations." Ex. 28 at 804. Dr. Brown explained that Plaintiff's symptoms are "typically of fluctuating mild to moderate severity," that Dr. Fried's testing results indicated "completely

9

intact cognitive function," and that "there is no consistent evidence of [Plaintiff] being unable to perform any activities that he chooses to do." *Id.* Dr. Brown also noted that Plaintiff's "psychotherapy records indicate a primary focus of treatment on complex family issues," rather than on his PTSD or fears of terrorism. *Id.* Finally, Dr. Brown opined that Plaintiff's "return to treatment has typically coincided with a focus on establishing disability benefits status rather than on symptom reduction of functional improvement." *Id.*

### D. Defendants' Decisions

As noted *supra,* on August 29, 2016, Defendants denied Plaintiff's claim for benefits. Ex. 18. Defendants noted that "reviews by our physicians and information provided by [Plaintiff's] treatment providers supported an inability to travel using ground public transportation," but explained that "travel in this manner is not a requirement of his occupation." Ex. 18 at 539. As such, Defendants concluded that Plaintiff was "able to perform his occupation," and was therefore "not disabled as defined by his policies." *Id.* On October 27, 2017, Defendants' decision was upheld on appeal. Ex. 29.

### E. Plaintiff is Able to Perform the Duties of his Occupation

Having reviewed all of the evidence in the administrative record, the Court finds that Plaintiff has failed to establish that he was unable to perform the material duties of his occupation as a bond salesman.

#### i.      Inability to Travel, Fly, or Visit Manhattan

Although Plaintiff claims that he is unable to travel, fly, or be in Manhattan, the Court finds these purported limitations to be unsupported by the evidence in the record. For example, Mr. Podell's treatment notes indicate that Plaintiff flew to Detroit in 2014 and traveled to Philadelphia in 2016. Ex. 6 at 237; Ex. 27 at 794. Moreover, Mr. Podell noted that Plaintiff felt "gratified that he was able to travel" to Detroit and "was pleased he was able to travel" to

Philadelphia.  *Id.*  Furthermore, in 2014, Plaintiff told Mr. Podell that he had a job interview for a financial sales position with a French bank.  Ex. 6 at 237.  Mr. Podell's notes do not indicate that Plaintiff believed he would be unable to travel, either within New York City or out of state, should the job require it.  Instead, Plaintiff viewed the interview as "good news" and stated that he was "looking forward to the challenge of the interview and the possibility of having to confront his fears by whatever he will be called to do if he is employed."  *Id.*

Moreover, although Plaintiff insists that he is unable to be in Manhattan without experiencing fear and panic, in March and April 2017, Mr. Podell noted that Plaintiff was using "breathing exercises and CBT tools with some effectiveness" to alleviate his anxiety and "pervasive fear[s]" about traveling into Manhattan.  Ex. 27 at 794.  Additionally, in July 2017, Plaintiff drove to lower Manhattan to take his son's friend home and "expressed pride in his ability to contain his anxiety and fears to drive through Manhattan."  *Id.* at 797.  Similarly, in 2017, Plaintiff told Mr. Podell that he was considering "seeking employment at a local brokerage firm on a commission basis."  *Id.* at 798.  Plaintiff expressed no concern that he would be unable to travel to Manhattan, or even outside New York City, if the job required it.

Dr. Feygin's treatment notes confirm that Plaintiff is able to travel, both within New York City and out of state.  Dr. Feygin expressly distinguishes between what Plaintiff is *unable* to do and what he merely avoids or struggles doing.  For example, in her 2015 treatment notes, Dr. Feygin stated that Plaintiff was "not able to take subway trains," but she noted only that Plaintiff "has difficulties flying."  Frumento Cert., Dkt. 41, Ex. 1 at 57.  Similarly, in 2017, although Dr. Feygin reported that Plaintiff "cannot use [the] subway," she merely noted that Plaintiff "rarely drives over bridges," "does not go to tall buildings," and "avoids [] crowded places."  Nazir Cert., Ex. 27 at 773-75.  In other words, although Dr. Feygin stated that Plaintiff was unable to ride the subway, she did not opine that Plaintiff was also unable to fly, travel, be in

Manhattan, or visit tall buildings. Plaintiff's assertion that Dr. Feygin did expressly opine that he was "unable to travel to New York City [or] to visit high-rise buildings," *see* Pl. Opp., Dkt. 41 Ex. 9 at 13, is misleading and inaccurate. Dr. Feygin's full statement reads: "[D]uring his several follow-up visits beginning January 12, 2017, Mr. Milano complained of certain limitations in his daily functioning related to his exposure to WTC attack in 2001. *He stated* that he is unable to travel to New York City, to visit high-rise buildings, and gets very anxious and overwhelmed in a [sic] crowded places." Ex. 24 at 697 (emphasis added). In other words, Dr. Feygin merely relayed Plaintiff's own statements regarding his limitations; she did not herself opine that Plaintiff was unable to travel, visit tall buildings, or be in crowded places such as Manhattan.

Defendants' reviewing psychiatrist, Dr. Brown, similarly concluded that Plaintiff's "fluctuating levels of anxiety and depression . . . [did] not support the presence of ongoing restrictions and limitations," such as an inability to fly, travel, or be in Manhattan. Ex. 28 at 804. Instead, Dr. Brown concluded that Plaintiff presented no consistent evidence, beyond his own self-reports, to establish that he was "unable to perform any activities that he [chose] to do." *Id.* Dr. Brown expressly relied on the results of psychological tests performed by Dr. Fried, which indicated that Plaintiff had "completely intact cognitive function." *Id.*

In sum, Plaintiff has provided no evidence, other than his own self-reports, to establish that he is unable to travel, fly, or visit Manhattan.[12]

---

[12] Because the Court finds that the evidence in the record does not support Plaintiff's purported inability to fly, travel, or be in Manhattan, the Court need not determine whether flying, traveling, or visiting Manhattan are, in fact, material duties of Plaintiff's occupation. Nevertheless, the Court notes that Defendants' vocational expert described the duties of a bond salesman as: making independent decisions; meeting deadlines; supervising others; multi-tasking; adhering to regulatory protocols/requirements; sustaining attention; problem solving; and performing mathematical calculations of high complexity. None of these duties necessarily requires travel, by plane or otherwise, or presence in Manhattan. Plaintiff has provided no evidence, other than his own self-reports, to prove that the duties of a bond salesman extend beyond those described by Defendants' vocational expert.

ii.      **Inability to Use Public Transportation**

The Court finds that Plaintiff's only supported limitation is an inability to use public transportation.  Dr. Feygin expressly opined that Plaintiff has an "ongoing limitation in riding [the] subway," and Mr. Podell stated that Plaintiff cannot travel by public transportation.  Ex. 6 at 241, Ex. 27 at 794.  Defendants' reviewing psychiatrist, Dr. Gitlow, agreed with Dr. Feygin that Plaintiff "has been limited in terms of [his] ability to use public transportation."  Ex. 14 at 445.

Notwithstanding his inability to take the subway, Plaintiff offers no evidence to suggest that taking public transportation is required in order to perform his job as a bond salesman.[13]  As Defendants' vocational expert explained, the material duties of a bond salesman include making independent decisions, meeting deadlines, supervising others, multi-tasking, adhering to regulatory protocols and requirements, sustaining attention, problem solving, and performing complex mathematical calculations.  Ex. 17 at 462.  None of these responsibilities requires that Plaintiff take the subway.[14]  Accordingly, Plaintiff's inability to use public transportation does not prevent him from doing his job as a bond salesman.

In sum, although Plaintiff claims he suffers from numerous limitations, the evidence in the record supports only Plaintiff's inability to take the subway.  Because Plaintiff's job does not require that he take the subway, Plaintiff has failed to establish that he was unable to perform the material duties of a bond salesman.

---

[13]      In fact, Plaintiff concedes that his inability to take the subway does not render him disabled under Defendants' policies.  *See* Pl. Opp. at 19 ("Obviously, if Mr. Milano's only limitation was that he could not ride the subway, he would not be disabled").

[14]      Moreover, even accepting as true Plaintiff's contention that interacting with clients is an essential duty of a bond salesman, Plaintiff offers no evidence that taking public transportation is required in order to meet with clients.

## CONCLUSIONS OF LAW

### A.  Standard of Review

A denial of benefits under ERISA "must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms."  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 102, 115 (1989).  Here, because the parties agree that the plan does not give any discretionary authority to the administrator, the Court conducts a *de novo* review.  The Court's *de novo* review "applies to all aspects of the denial of an ERISA claim, including fact issues," and the Court owes no deference to the administrator's determination.  *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 245 (2d Cir. 1999); *Muller,* 341 F.3d at 124.

### B.  Applicable Law

A participant or beneficiary of an ERISA-covered plan may sue "to recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).  Plaintiff bears the burden of proving by a preponderance of the evidence that he was disabled as defined by Defendants' policies.  *Paese v. Hartford Life & Accident Ins. Co*., 449 F.3d 435, 441 (2d Cir. 2006); *Sigal v. Metro. Life Ins. Co.,* No. 16-CV-3397, 2018 WL 1229845, at *5 (S.D.N.Y. Mar. 5, 2018); *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 671 (S.D.N.Y. 2011).  As noted *supra,* Plaintiff is totally disabled under Defendants' policies if he is unable to perform the "substantial and material" or "important" duties of his occupation.  Exs. 2-3.

The Court may "take account of several different considerations" in determining whether Plaintiff is disabled under the terms of Defendants' policies.  *Metro. Life. Ins. Co. v. Glenn,* 554 U.S. 105, 117 (2008).  Such considerations include the opinions of Plaintiff's treating physicians, Defendants' reviewing physicians, and Plaintiff's own self-reports of his symptoms.  *Connors v. Connecticut Gen. Life Ins. Co.,* 272 F.3d 127, 136 (2d Cir. 2001); *Barbu*, 35 F. Supp. 3d at

289.   "Subjective complaints of disabling conditions are not merely evidence of a disability, but are an important factor to be considered in determining disability." *Miles v. Principal Life Ins. Co.,* 720 F.3d 472, 486 (2d Cir. 2013) (internal quotations omitted); *Connors,* 272 F.3d at 136 (explaining that "while a district court reviewing an administrator's decision *de novo* is not required to accept [subjective] complaints as credible, it cannot dismiss complaints of pain as legally insufficient evidence of disability.").

The Court has concluded that the evidence in the administrative record does not establish that Plaintiff was unable to perform the duties of his occupation at the time that Defendants denied his claim for benefits.  Although Plaintiff's self-reports of his symptoms are certainly *some* evidence of his purported limitations, such self-reports alone do not persuade the Court that he was unable to perform the duties of a bond trader.  The remaining evidence in the record, including statements by Plaintiff's own treating psychiatrist and psychotherapist, supports the conclusion that Plaintiff has some psychological issues and stressors in his personal life, but the evidence does not support a finding that his psychological issues are debilitating.  Plaintiff has proven that he cannot use New York City public transportation.  Because use of public transportation is not a material duty of Plaintiff's occupation, nor is it necessary to perform the material duties of his occupation, Plaintiff has failed to meet his burden to demonstrate that he was disabled under the terms of Defendants' policies.

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff is not disabled under the

terms of Defendants' policies and is therefore not entitled to disability benefits.  Accordingly,

this case is DISMISSED.


**SO ORDERED.**

**Date:  December 16, 2020**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**